[No. B217853. Second Dist., Div. Eight. Nov. 17, 2009.]

NUTRAGENETICS, LLC, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ROBERT CAVENAH, Real Party in Interest.

COUNSEL

Stearns Kim & Stearns, Lawrence P. Bemis, Ryan E. Stearns and Lauren B. Browne for Petitioner.

No appearance for Respondent.

Gallo & Associates, Ray E. Gallo and Sharon S. Laveson for Real Party in Interest.

OPINION

MOHR, J.*—

## SUMMARY

This writ proceeding challenges the trial court's acceptance of a motion to disqualify the trial judge under Code of Civil Procedure section 170.6, which permits a peremptory challenge to the judge.[1] Plaintiff filed two successive lawsuits, some two and one-half months apart, against different defendants, alleging some identical and some different causes of action, but both arising from substantially the same underlying events. The two lawsuits were deemed related. When the second lawsuit was assigned to the same judge as the first, plaintiff moved to disqualify the judge, who by then had made a ruling unfavorable to plaintiff (granting a petition to compel arbitration) in the first lawsuit. The question is whether the second lawsuit against a different defendant constituted a continuation of the first lawsuit rather than a separate and independent action, thus rendering plaintiff's peremptory challenge untimely.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

Because the second lawsuit (1) involves a different defendant and different causes of action asserted against that defendant, and (2) does not arise from conduct in, or involve enforcement or modification of an order in, the first lawsuit, we conclude that the second action cannot be considered a continuation of the first within the meaning of governing Supreme Court precedent. Accordingly, the trial court properly found the peremptory challenge to be timely, and we deny the writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 6, 2009, Robert Cavenah sued Dave Brubaker, Andrew Myers and Louis Ignarro (collectively, the Brubaker defendants), claiming they defrauded him of more than $1 million, consisting of $500,000 in cash and more than two years of his time. Cavenah alleged Brubaker and Myers solicited him to invest in, and work full time for, NutraGenetics, LLC, a company the Brubaker defendants and others had organized in 2004. They formed NutraGenetics to develop and market nutritional supplements containing nitric oxide, utilizing the expertise of defendant Ignarro, who had won a Nobel Prize in 1998 for his work related to that chemical. Cavenah alleged the Brubaker defendants induced him to purchase an interest in NutraGenetics for $250,000, and he later purchased an additional interest from defendant Brubaker for another $250,000. Brubaker and Myers also promised him in writing that NutraGenetics could and would pay him a $250,000 annual salary beginning no later than January 1, 2007. Cavenah alleged he invested in and worked for the company in reliance on several misrepresentations and failures to disclose material facts, including a failure to disclose that Ignarro was prohibited from developing or promoting products for NutraGenetics by virtue of an earlier agreement with another company, and misrepresentations that NutraGenetics had been assured revenues from long-term agreements with two other companies, when in fact those deals were actually contingent, doubtful, or terminable.

In the first lawsuit, which we refer to as *Cavenah I* or the first action, Cavenah alleged four causes of action against the Brubaker defendants: fraud and deceit, negligent misrepresentation, constructive fraud, and unlawful, unfair or fraudulent business practices under Business and Professions Code section 17200. Cavenah sought economic damages estimated at $1,125,000, consisting of the loss of his $500,000 investment and more than two years of working without compensation. He also asked for noneconomic and punitive damages.

*Cavenah I* was assigned for all purposes to Judge Holly E. Kendig. Thereafter:

—During the first half of March 2009, Cavenah served numerous discovery requests in *Cavenah I*.

—On March 19, 2009, the Brubaker defendants filed a petition to compel arbitration. The petition was based on NutraGenetics's operating agreement, to which Cavenah and the Brubaker defendants were parties. The agreement provided that "[a]ny action to enforce or interpret this Agreement, or to resolve disputes with respect to this Agreement as between [NutraGenetics] and a Member, or between or among the Members, shall be settled by arbitration . . . ." At the same time, the Brubaker defendants filed an ex parte application to stay *Cavenah I*, including Cavenah's discovery requests.

—On April 7, 2009, Judge Kendig stayed *Cavenah I*, "inclusive of discovery," pending a further hearing set for April 30, 2009, on the application to stay the litigation. The court's order also vacated the April 30, 2009 hearing date for the motion to compel arbitration and indicated a date for that motion would be set after the hearing on the stay request.

Two weeks later, on April 21, 2009, before any hearings on the stay application or the motion to compel arbitration, Cavenah filed a second lawsuit, this time against NutraGenetics (*Cavenah II*). Cavenah alleged causes of action for breach of written contract, violation of Labor Code section 203 (governing an employer's failure to pay wages of an employee who is discharged or who quits), quantum meruit, fraud, and violations of Business and Professions Code section 17200. Cavenah alleged the same underlying conduct as in *Cavenah I*, but additionally alleged that in September 2005, he had signed a letter agreement with NutraGenetics in which he agreed to work with the company full time for an annual wage of at least $250,000. He claimed that according to the letter agreement, he was to begin receiving this wage as a cash salary no later than January 1, 2007, and was to receive stock for his earlier work. He sought unpaid wages of "more than $650,000," prejudgment interest, late penalties and attorney fees and costs under the Labor Code, $20,548 in Labor Code penalties for failure to pay wages earned for 30 days after his termination date (May 31, 2008), and punitive damages on his fraud claim. *Cavenah II* was assigned for all purposes to Judge James R. Dunn.

On the same day that he filed *Cavenah II*, Cavenah filed a "Notice of Related Case," indicating that *Cavenah II* and *Cavenah I* arose from "the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact," and were "likely for other reasons to require substantial duplication of judicial resources if heard by different judges."

Then the following events occurred:

—On April 28, 2009, the Brubaker defendants and NutraGenetics filed statements of nonopposition to Cavenah's notice of related cases.

—On April 30, 2009, the trial court granted the Brubaker defendants' motion to stay *Cavenah I*, pending a May 14, 2009 hearing date for their motion to compel arbitration. (The court observed that it was continuing the stay it had already put in effect, "formalizing it" under § 1281.4 (which requires a stay, upon motion of a party, when a petition to compel arbitration is pending).)

—On May 14, 2009, the court granted the petition of the Brubaker defendants to compel arbitration in *Cavenah I*.

—On May 27, 2009, Judge Kendig ruled that *Cavenah I* was not related to *Cavenah II*. She observed that *Cavenah I* had been stayed, so there would be no duplication of judicial resources if the cases remained as they were then assigned.

—On June 1, 2009, Cavenah sent discovery requests to NutraGenetics in *Cavenah II*. These requests were substantially the same requests he had made to the Brubaker defendants in *Cavenah I*.

—On June 2, 2009, NutraGenetics and the Brubaker defendants moved for reconsideration and applied to deem the two actions related.[2] Cavenah filed an opposition to the motion for reconsideration on June 17, 2009, arguing (inter alia) that Judge Kendig's ruling that the cases were not related was "a practical and substantively proper" decision because *Cavenah I* was "arguably governed by the operating agreement pursuant to which that case was ordered to arbitration," while *Cavenah II* was "an employee's suit against his employer arising under a separate employment agreement and the Labor Code, invoking numerous employee rights, and not subject to arbitration."

—Meanwhile, on June 8, 2009, NutraGenetics filed a petition to compel arbitration in *Cavenah II*. NutraGenetics argued that (1) Cavenah was "attempting to 'redo' the proceedings in *Cavenah I* by filing the same action as *Cavenah II*, but limiting it to his 'employment' claims"; (2) Cavenah was "bound by the final determination of Judge Kendig in the first action"; and (3) "the issue of arbitrability is foreclosed by the doctrine of res judicata."

---

[2] NutraGenetics and the Brubaker defendants argued that, as a result of the three hearings in *Cavenah I*, "Judge Kendig is familiar with counsel, the parties, the identical facts in both these complaints, and the arguments surrounding the arbitrability of [Cavenah's] claims. It would thus be more efficient and a better use of judicial resources for *Cavenah II* to be deemed related to *Cavenah I* and transferred to Judge Kendig's court."

—On June 29, 2009, Cavenah filed his opposition to NutraGenetics's petition to compel arbitration, again arguing that the arbitration clause in the operating agreement (which applied to "disputes with respect to this Agreement as between [NutraGenetics] and a Member") by its terms did not apply to his claim against NutraGenetics for breach of an employment agreement "entered into long before and separate from NutraGenetics' operating agreement."

—On June 30, 2009, the trial court (Judge Elihu M. Berle in Department 1) found the two actions were related and transferred *Cavenah II* to Judge Kendig.[3] The court found that while *Cavenah II* included an additional claim for breach of Cavenah's employment agreement, "both cases involve substantially the same acts of misconduct and will require determination of substantially the same issues." Further, "[w]hile [Cavenah] argues that his employment was governed by an entirely different letter agreement, the Petition in *Cavenah II* [to compel arbitration] will still require the interpretation and application of the same document [the operating agreement] between the same parties," and it appeared likely that a substantial duplication of labor would be required if the cases were heard by different judges.

—On July 8, 2009, Cavenah filed his peremptory challenge against Judge Kendig under section 170.6.

—NutraGenetics opposed the disqualification motion, arguing that a judge cannot be disqualified after he or she has heard an issue that involves a ruling on contested factual issues related to the merits of the case, which Judge Kendig had done when she enforced the operating agreement's arbitration clause in *Cavenah I. Cavenah II*, NutraGenetics claimed, was a continuation of *Cavenah I* because it involves " ' "substantially the same issues" ' " as *Cavenah I*, citing *McClenny v. Superior Court* (1964) 60 Cal.2d 677, 684 [36 Cal.Rptr. 459, 388 P.2d 691] (*McClenny*).

On July 16, 2009, Judge Kendig found that Cavenah's peremptory challenge was timely filed, accepted it, and transferred both *Cavenah I* and *Cavenah II* to Department One for reassignment.

NutraGenetics filed this petition for writ of mandate directing the trial court to vacate its order and to deny Cavenah's motion to disqualify Judge Kendig. It also requested a stay "of the related actions," including all pending discovery in *Cavenah II*. This court issued a temporary stay order and

---

[3] The Superior Court of Los Angeles County, Local Rules, rule 7.3(f)(4) provides that if cases are not ordered related pursuant to California Rules of Court, any party in any of the cases may file an application to have the cases related, either in Department One or with the supervising judge of a district other than the central district, depending on the circumstances.

directed Cavenah to file a preliminary response to the petition. Following the preliminary response and a reply from NutraGenetics, we issued an alternative writ, ordering the trial court to vacate its order and enter a new order denying the disqualification motion as untimely, or to show cause why a peremptory writ requiring it to do so should not issue. Cavenah filed a written return to the petition and NutraGenetics filed a reply.

We now deny the writ petition.

## DISCUSSION

NutraGenetics asserts that Cavenah's peremptory challenge to Judge Kendig was "a flagrant example of judge shopping under [section 170.6]," and an "attempt by [Cavenah], through a 'sham pleading' to use section 170.6 as a weapon of offense and thereby obstruct the efficient administration of justice." "In substance and in form," NutraGenetics says, "*Cavenah II* is identical to *Cavenah I*," and Cavenah's challenge to Judge Kendig was not timely because *Cavenah II* "is a mere continuation" of *Cavenah I*.

In order to place this case in its proper context, we review the principles that have been established with respect to the interpretation of section 170.6 and then apply those principles to this case.

### A. *Section 170.6 and the "continuation" rule.*

" '[I]n enacting Code of Civil Procedure section 170.6 the Legislature guaranteed to litigants an extraordinary right to disqualify a judge.' " (*Solberg v. Superior Court* (1977) 19 Cal.3d 182, 193 [137 Cal.Rptr. 460, 561 P.2d 1148] (*Solberg*).) Section 170.6 permits a party to disqualify a judge for prejudice based only upon a sworn affidavit. (*Bravo v. Superior Court* (2007) 149 Cal.App.4th 1489, 1493 [57 Cal.Rptr.3d 910] (*Bravo*).) As *Solberg* explained, " 'The right is "automatic" in the sense that a good faith *belief* in prejudice is alone sufficient, proof of facts showing actual prejudice not being required.' " (*Solberg, supra*, at p. 193.) "If the motion is timely and filed in proper form, the trial court must accept it without further inquiry, and the disqualification is effective immediately." (*Bravo, supra*, at p. 1493.) A peremptory challenge must be made within 10 days after notice of an all-purpose assignment.[4] (§ 170.6, subd. (a)(2).) " 'As a remedial statute, section 170.6 is to be liberally construed in favor of allowing a peremptory

---

[4] In direct calendar courts, challenges pursuant to section 170.6 must be exercised within 15 days of the party's first appearance. (Gov. Code, § 68616, subd. (i).) If a case is subsequently transferred to a different judge, parties who have already appeared may file a peremptory challenge to the new judge within 15 days after receiving notice of the change. (*Cybermedia, Inc. v. Superior Court* (1999) 72 Cal.App.4th 910, 913 [82 Cal.Rptr.2d 126].)

challenge, and a challenge should be denied only if the statute absolutely forbids it.' " (*Bravo, supra*, at p. 1493.)

At the same time, as *Solberg* tells us, the courts "have been vigilant to enforce the statutory restrictions on the number and timing of motions permitted." (*Solberg, supra*, 19 Cal.3d at p. 197.) Thus, *Solberg* explains, the Supreme Court has construed the statutory limitation of one motion "in any one action" (§ 170.6, subd. (a)(3)) to bar a second motion made on retrial. (*Pappa v. Superior Court* (1960) 54 Cal.2d 350, 353 [5 Cal.Rptr. 703, 353 P.2d 311].) In addition the Supreme Court has construed the statutory requirement that the motion be filed before "trial of the cause has . . . commenced" (§ 170.6, subd. (a)(2)) "to prohibit making a motion for the first time in post-trial matters which are essentially a 'continuation' of the main proceeding, such as hearings on orders to modify [citation] or enforce [citation] the original judgment." (*Solberg, supra*, at pp. 197–198.)

It is this "continuation" rule, first enunciated in *Jacobs v. Superior Court* (1959) 53 Cal.2d 187 [1 Cal.Rptr. 9, 347 P.2d 9] (*Jacobs*), that we address in this case. NutraGenetics contends that *Cavenah II* is "a part or a continuation of the original proceedings" (*id.* at p. 190) of *Cavenah I*, within the meaning of *Jacobs* and its progeny, so that Cavenah's disqualification motion was untimely. Our review of *Jacobs* and its progeny, however, leads us to conclude otherwise. We turn now to an examination of those cases, bearing in mind that the second action in the case before us arises from substantially the same acts of misconduct and requires determination of substantially the same issues, but is brought against a different defendant and asserts several additional bases of liability as to that defendant.

We begin with *Jacobs*, which presented the question whether, in an action to modify the custody provisions of an earlier judgment, a disqualification motion was timely. (*Jacobs, supra*, 53 Cal.2d at p. 190.) The court held that it was not, first observing that, although section 170.6 does not expressly so provide, "it follows that, since the motion must be made before the trial has commenced, it cannot be entertained as to subsequent hearings which are a part or a continuation of the original proceedings." (*Jacobs*, at p. 190.) The court stated that in situations involving guardianship and custody orders, "subsequent proceedings to obtain changes in custody are continuations of the original proceeding to determine custody." (*Ibid.*) In *Jacobs*, except for an alleged change in circumstances, "the issues presented by the motion to modify the judgment . . . and the supplemental petition for appointment of guardians are the same as those heard by Judge Rhodes in the prior proceedings." (*Id.* at p. 191.) If disqualifications were permitted in matters that are continuations of a prior proceeding, the court continued, "it would mean that the judge who tried the case, and who is ordinarily in the best

position to pass upon the questions involved, could . . . be disqualified from hearing such matters as motions for modification of a support order or an injunction, as well as motions for change of custody of children. Such procedure would make it possible for litigants to gamble on obtaining a favorable decision from one judge, and then, if confronted with an adverse judgment, allow them to disqualify him without presenting facts showing prejudice, in the hope of securing a different ruling from another judge in supplementary proceedings involving substantially the same issues." (*Jacobs, supra,* 53 Cal.2d at p. 191.) In reaching its conclusion, *Jacobs* reasoned: *"The parties are the same, and the paramount questions to be decided by the court,* i.e., the competency of the father and the best interests of the children, *are the same." (Ibid.,* italics added.)

As *Solberg* characterized the decisions that follow *Jacobs,* the continuation rule is generally applied in "post-trial matters which are essentially a 'continuation' of the main proceeding . . . ." (*Solberg, supra,* 19 Cal.3d at pp. 197–198.) We look now to the cases NutraGenetics cites to support its contention that the continuation rule applies to this case, which is not a "post-trial matter[]."

First comes *McClenny, supra,* 60 Cal.2d 677, which held that a disqualification motion was not timely "when filed prior to a proceeding on an indirect contempt which is supplementary to a domestic relations action." (*Id.* at pp. 678–679.) In *McClenny,* the trial court had entered an interlocutory divorce decree and awarded the wife custody of the child. Several months later, the husband filed a motion for modification of the custody order, and the wife sought a contempt proceeding for the husband's refusal to return the child after a recent visitation period. The husband sought to disqualify the trial judge from the hearing on the contempt matters. After examining numerous cases in which the *Jacobs* holding had been "applied, restated, and amplified," the court concluded that the gravamen of *Jacobs* established "that a proceeding is a continuation *of the original action out of which it arises* if it involves 'substantially the same issues' as the original action." (*McClenny,* at p. 684, italics added.) *McClenny* also cited with approval *Oak Grove School Dist. v. City Title Ins. Co.* (1963) 217 Cal.App.2d 678, 699 [32 Cal.Rptr. 288] (*Oak Grove*), stating that *Oak Grove* "cogently restated the rule" when it held that "the presentation in the supplementary proceeding of 'matters *necessarily relevant and material to the issues involved in the* [original] *action'* stamped the supplementary proceeding as a continuation of the original action." (*McClenny,* at p. 684, quoting *Oak Grove,* at p. 699.)

Applying to the facts before it the principles it gleaned from *Jacobs, Oak Grove* and other progeny of *Jacobs, McClenny* "note[d] the substantial degree of similarity and even identity between the issues to be raised in the pending

contempt proceeding and the issues previously presented to Judge McCarthy." (*McClenny, supra,* 60 Cal.2d at p. 684.) The court concluded that "the questions involving the interpretation of the orders allegedly contemned, and indeed, the issue of whether defendant in fact violated Judge McCarthy's orders, are 'matters *necessarily relevant and material to the issues involved in the* [original] *action.*' " (*McClenny,* at p. 684, quoting *Oak Grove, supra,* 217 Cal.App.2d at p. 699.) The court further observed that in domestic relations actions, the courts "must exercise a continuing jurisdiction over the parties and over the subject matter," and must "perform continuing supervisory and enforcing functions, and the contempt proceeding is one of the court's two principal means of performing these functions." (*Id.* at p. 688.) It would "unduly impede the administration of justice" to hold that the contempt proceeding constituted a separate and independent action. (*Ibid.*) To do so would "permit litigants to obtain, by repeated cycles of a contemptuous act and a motion based upon section 170.6, a perpetually fresh forum for testing disadvantageous decisions." (*Id.* at p. 689.) It was in this context that the court said, "We cannot permit a device intended for spare and protective use to be converted into a weapon of offense and thereby to become an obstruction to efficient judicial administration." (*Ibid.*)

■ Both *Jacobs* and *McClenny* involved the same parties and *arose out of the original action,* involving either the enforcement or modification of orders made in the original action. In *Oak Grove,* likewise, the second action involved the same parties and arose out of the original action. In *Oak Grove,* the court held that a motion to tax costs in an abandoned eminent domain proceeding was "a part and a continuation of the original eminent domain proceedings, within the meaning of the rule laid down in [*Jacobs*] . . . ." (*Oak Grove, supra,* 217 Cal.App.2d at p. 699.) As *Oak Grove* observed: "The essence of the rule stated in *Jacobs* is that *in a supplemental or continued hearing on matters involved in the original proceeding* an application under section 170.6 for disqualification of the same judge who heard the original proceeding is not proper or timely . . . ." (*Ibid.,* italics added.) Thus, "[t]hese costs and disbursements *arise out of* and are necessarily relevant and material to the issues involved in *the eminent domain action,*" precluding a disqualification under section 170.6. (*Oak Grove,* at pp. 700, 699, italics added.)

In addition to *Jacobs* and *McClenny,* NutraGenetics places its reliance on three Court of Appeal cases applying the *Jacobs* and *McClenny* principles. But, as we shall see, none of them helps NutraGenetics, because none of them varies from the underlying principle of the continuation rule: the second proceeding involves the same parties (on both sides of the case) as the first proceeding, and the second proceeding arises out of the first proceeding, not just out of the same set of facts that gave rise to the first proceeding.

—In *Andrews v. Joint Clerks Port Labor Relations Committee* (1966) 239 Cal.App.2d 285 [48 Cal.Rptr. 646] (*Andrews*), the objective of the second action "was to obtain a modification of the [order] still in effect in [the first action]," so the second action was "demonstrably a *continuation* of, and *ancillary* to, [the proceedings] previously had" (*id.* at p. 296), and the plaintiffs' motion for disqualification of the trial judge was therefore not timely (*id.* at p. 288). The facts in *Andrews* are complex, but the context in which the continuation rule is applied is precisely the same as in the other cases: the parties in both actions were the same, and the second action, as in *Jacobs*, involved an attempt to modify an order made in the original action. In *Andrews*, the plaintiffs brought an action alleging breach of a collective bargaining agreement, claiming they had suffered arbitrary discrimination in various respects in connection with their employment as ship clerks (*id.* at pp. 288–289). After extended proceedings, the trial judge stayed the action pending submission of the issues to a grievance arbitration procedure before one Professor Kagel. (*Id.* at p. 289 & fn. 5.) The parties tendered two sets of issues to the arbitrator and agreed he had jurisdiction to determine both. (*Id.* at p. 290.) After Professor Kagel decided the first set of issues adversely to the plaintiffs, the plaintiffs (1) moved in the trial court for an order vacating the court's stay order, or alternatively for the naming of "an impartial and neutral arbitrator," and (2) filed a second action seeking to name an impartial and neutral arbitrator to decide the second set of issues. (*Id.* at p. 291.) The complaint in the second action alleged a dispute " '*arising since and arising from* [the first action] pending' " in the trial court and claimed Professor Kagel was not impartial. (*Ibid.*) The plaintiffs sought unsuccessfully to disqualify the trial judge in the second action. The Court of Appeal found:

> —The clear purpose of the second action "was to secure the removal of Professor Kagel as arbitrator . . . and proceed before a new arbitrator . . . . Thus, simply stated, the objective of [the second action] was to obtain a modification of the . . . order still in effect in [the first action]. Indeed, by seeking a continuance of the arbitration, albeit under a new arbitrator, the [second action was] demonstrably a *continuation* of, and *ancillary* to, [the first action]." (*Andrews, supra*, 239 Cal.App.2d at p. 296.)

> —"The question presented by the proceedings in [the second action] as to whether a new arbitrator should be named . . . was inextricably bound up with the previous determination of the court in [the first action] that arbitration should proceed before Professor Kagel . . . . Hence, the question raised by the [second action] was necessarily relevant and material to the previous directions for arbitration made by the court as part of its stay order. As such, it establishes that the later proceeding is in fact a continuation of the original one." (*Andrews, supra*, 239 Cal.App.2d at p. 297.)

—Additional "telling" evidence that the second action was a continuation of the first was the fact that the plaintiffs simultaneously filed the second action *and* moved to vacate the trial judge's previous stay order (or alternatively to name a new arbitrator) in the first action. (*Andrews, supra,* 239 Cal.App.2d at p. 297.) "It is obvious to us, as it was to the trial judge, that these plaintiffs and their counsel, 'split' their motion to modify the previous order of the court and by a 'spin-off' device attempted to fashion a 'new and independent action' in which to assert a peremptory challenge against the judge." (*Id.* at p. 298.) "If this were countenanced, a party could circumvent the statute by the simple expedient of having a supplementary or ancillary proceeding filed under a new number." (*Ibid.*)

—NutraGenetics next cites *Le Louis v. Superior Court* (1989) 209 Cal.App.3d 669 [257 Cal.Rptr. 458] (*Le Louis*). In *Le Louis*, the defendant in a criminal action contended that his filing of a section 170.6 challenge at a preliminary hearing before a municipal court judge did not preclude the filing of a similar challenge to the superior court judge assigned for trial. (209 Cal.App.3d at p. 674.) The Court of Appeal disagreed, concluding that the defendant "was not authorized to exercise one peremptory challenge at the municipal court level and another at the superior court level in the same criminal action."[5] (209 Cal.App.3d at p. 683.) The court also rejected the defendant's claim that, because the district attorney filed two successive felony complaints (the second containing an additional conspiracy count), the defendant was entitled to a peremptory challenge with respect to each complaint. The court observed that the second complaint supplanted or superseded the first complaint "and the preliminary examination was a unified hearing to determine sufficiency of the evidence to proceed on the three charges pending in the two complaints." (*Id.* at pp. 680–681.) The court cited *McClenny* and concluded that the superior court proceedings were a continuation of the criminal proceedings maintained in the municipal court; the issues "were certainly similar if not identical and arose in proceedings which constituted a 'criminal action.' " (*Id.* at p. 682.) The court held that when the two separate complaints were consolidated for preliminary hearing, "[f]rom

---

[5] The defendant initially had been charged with two counts of solicitation of murder (in the People's first complaint) and filed a peremptory challenge to the judge. After that challenge, the district attorney filed a second complaint, adding a charge of conspiracy to commit murder (and naming a codefendant). (*Le Louis, supra,* 209 Cal.App.3d at pp. 679–680.) At the preliminary hearing, the defendant was held to answer on all three counts, and an information was filed charging the defendant on the three counts. (*Id.* at p. 681.) After the case was assigned for trial, the defendant sought to disqualify the trial judge. The Court of Appeal concluded that the preliminary examination is part of a "criminal action" and not a separate or "special proceeding" (*id.* at p. 678), and the court rejected the defendant's argument that the first complaint and the second complaint were separate and distinct, entitling him to a peremptory challenge on the second complaint (*id.* at pp. 680–681).

that point forward, they became one proceeding for purposes of Code of Civil Procedure section 170.6 disqualification . . . ." (*Id.* at p. 683.)

—Finally, NutraGenetics cites *Bravo, supra*, 149 Cal.App.4th 1489, which simply quoted the language of *Jacobs, McClenny* and *Oak Grove* to the effect that a proceeding is a continuation of a prior action "if 'it involves " 'substantially the same issues' " and " 'matters necessarily relevant and material to the issues involved in the [original] action.' " [Citation].' " (*Bravo,* at p. 1494.) In *Bravo*, the plaintiff brought a second lawsuit against his employer, after his previous action for discrimination based on sexual orientation and retaliation resulted in a judgment for the employer. The second action alleged claims for harassment, discrimination and retaliation, based on events occurring after the events alleged in his first action. The cases were deemed related and the second action was assigned to the trial judge who had heard the first action. The plaintiff then challenged the judge under section 170.6. *Bravo* rejected the employer's claim that because the two actions were related cases, the second was a continuation of the first. The court held that, although the two cases involved the same employee and the same employer, "the current action arises out of later events distinct from those in the previous action," so it was not a continuation of the previous action and the challenge was timely. (149 Cal.App.4th at p. 1494.)

### B.   *Application of the continuation rule to this case.*

■ From *Jacobs* and the ensuing line of cases, we perceive one salient point. All the cases applying the continuation rule to preclude a peremptory challenge in the second proceeding *involve the same parties at a later stage of their litigation with each other, or they arise out of conduct in or orders made during the earlier proceeding.* In other words, the continuation rule applies in cases in which the second action arises out of, or is a later stage of, the original action involving the same parties. This is so in every case on which NutraGenetics relies: in *Jacobs*, in *McClenny*, in *Andrews*, and in *Le Louis*. But it is not so in the actions before us.

We are not aware of any decision that permits us to deem a suit against a different defendant with different causes of action and different bases of liability—and indeed filed almost contemporaneously—to be a "continuation" of an earlier filed suit against other defendants. *McClenny* expressly tells us that *Jacobs* established "that a proceeding is a continuation of the original action *out of which it arises*" if it involves substantially the same issues as the original action. (*McClenny, supra*, 60 Cal.2d at p. 684, italics added.) In other words, the second proceeding must arise out of the first proceeding—not merely, as NutraGenetics suggests, out of the same incidents or events that gave rise to the first proceeding. (See *The Home Ins. Co. v. Superior Court*

(2005) 34 Cal.4th 1025, 1033, fn. 4 [22 Cal.Rptr.3d 885, 103 P.3d 283] ["we have interpreted the phrase 'any one action' to encompass several stages of the same proceeding," "[i]n general, a party that has disqualified a judge pursuant to section 170.6 may not exercise a challenge against the substituted judge *either during the trial or in any later proceeding* that is a 'continuation' of the original proceeding" (italics added)]; cf. *Ziesmer v. Superior Court* (2003) 107 Cal.App.4th 360, 365 [132 Cal.Rptr.2d 130] [rejecting claim that a criminal action refiled after the dismissal of a grand jury indictment was a continuation of the original proceedings; the *Jacobs* line of cases "involve postjudgment proceedings so closely related to the initial case in which the merits had been decided that they are a continuation of the former proceeding"].)

■ There is no doubt at all that *Cavenah I* and *Cavenah II* are related to each other. Everyone agrees (and Cavenah himself told the court) that *Cavenah I* "arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact" as *Cavenah II*. But that is the standard for determining whether cases are related, not for determining whether one case constitutes a continuation of another. This point was made in *Bravo*, which expressly held that "[t]he fact that the cases are related does not resolve the issue of whether the second case is a continuation of the first case for purposes of section 170.6." (*Bravo, supra,* 149 Cal.App.4th at p. 1494 ["although the two cases involve the same employee and the same employer, the current action arises out of later events distinct from those in the previous action"].)

*Nissan Motor Corp. v. Superior Court* (1992) 6 Cal.App.4th 150 [7 Cal.Rptr.2d 801] (*Nissan*) is also instructive, although it involves different plaintiffs as opposed to different defendants. Three unrelated products liability actions were filed against the same defendant (Nissan) by different plaintiffs at different times for injuries arising out of the same alleged defect in Nissan automobiles. The cases were assigned to different judges, and Nissan did not file any peremptory challenges. On its own motion, the superior court consolidated the three actions and transferred the later two actions to the judge assigned to the first lawsuit, who had already made pretrial rulings. Nissan filed peremptory challenges in the later two actions, and the trial court denied them as untimely, believing it would be "ridiculous" to have the three cases before three judges " 'on the same issue.' " (*Id.* at p. 154.) The Court of Appeal disagreed and observed that "[a] party's acquiescence of a judge to hear one action does not impair his or her right to exercise a challenge to prevent that judge from hearing another matter, even if that matter raises issues closely related to those in the first action." (*Id.* at p. 155 [" 'the fact that a party can peremptorily challenge a judge after he has ruled in a case involving related factual or legal issues may result to some

extent in forum shopping by parties filing later similar suits,' " but " 'collateral estoppel does not apply to disqualification motions' "].) The court found the two later actions could not be characterized as "continuations" of the first, because they arose out of different injuries and damages to different vehicles at different times, and were thus separate and distinct cases "entitled to separate challenges under section 170.6."[6] (6 Cal.App.4th at p. 155.)

At bottom, NutraGenetics's contention that Judge Kendig erred in accepting Cavenah's disqualification motion centers on the claim with which NutraGenetics begins its writ petition: that *Cavenah II* is a "sham pleading,"[7] and Cavenah's disqualification motion is "a flagrant example of judge shopping." We disagree with the first claim. The fact that Cavenah could have sued NutraGenetics in *Cavenah I* does not automatically turn his second pleading into a sham.[8] As for the claim of "judge shopping," NutraGenetics itself points out in its reply that whether Cavenah was "judge shopping" is "not a fact that is dispositive of whether his motion was timely."

We do not mean to downplay the importance of vigilance by the courts in refusing to "permit a device intended for spare and protective use to be converted into a weapon of offense and thereby to become an obstruction to efficient judicial administration." (*McClenny, supra,* 60 Cal.2d at p. 689.) We are concerned about counsel and parties who abuse the 170.6 procedure. We wish we could do more to stop this behavior. But we have to follow the law as it currently exists. We also must point out that both the Legislature and the Supreme Court were aware that the peremptory challenge procedure would be open to various abuses, and the Supreme Court concluded that these abuses were a "relatively inconsequential price to be paid for the efficient and discreet procedure provided in section 170.6." (*Solberg, supra,* 19 Cal.3d at

[6] As in this case, in *Nissan* the parties (there, the plaintiffs) were different, and, while the *Nissan* cases arose from different accidents, they also arose from the same conduct by the defendant: the manufacture of vehicles containing the same injury-producing defect. (*Nissan, supra,* 6 Cal.App.4th at pp. 152–153.)

[7] NutraGenetics also asserts that Cavenah "file[d] a second action to avoid the court's May 14, 2009, order [compelling arbitration] . . . ." In fact, Cavenah filed *Cavenah II* three weeks *before* the court ordered *Cavenah I* to arbitration. Moreover, the question whether Cavenah's claim in *Cavenah II*—that NutraGenetics breached a preexisting employment agreement—is subject to arbitration under the language of the arbitration clause in the NutraGenetics operating agreement presents a question significantly different from whether the claims in *Cavenah I* were subject to arbitration.

[8] Cavenah offered a colorable reason for his action, claiming that when he filed *Cavenah II,* he had recently learned that NutraGenetics "might, contrary to previous belief, be able to satisfy a judgment." NutraGenetics says that "[a]ny other party in litigation would simply have filed a motion for leave to amend the first action," but as Cavenah points out, he wanted to preserve the statute of limitations, the first action had been stayed, a motion for leave to amend would have been required, and he believed the second action was properly separate and not subject to arbitration.

p. 204.) *Solberg* discussed "judge shopping" in some detail, describing such practices as "blanket challenges" in the criminal courts against judges based on dissatisfaction with their legal rulings on a particular issue, rather than on a belief they were personally prejudiced within the meaning of the statute. The court also discussed other abuses such as the invocation of section 170.6 to gain "purely tactical advantages." (*Solberg*, at pp. 194–195.) But the possibility of such abuse " 'was a matter to be balanced by the Legislature against the desirability of the objective of the statute' " (*id.* at p. 196), which was to enhance public confidence in the judicial system.[9] And, " 'the Legislature clearly foresaw that the peremptory challenge procedure would be open to such abuses but intended that the affidavits be honored notwithstanding misuse.' " (*Solberg*, at pp. 203–204, fn. omitted.)

■ We make the foregoing point not for the purpose of characterizing Cavenah's use of section 170.6 as an abuse of the statute, but to emphasize that this question plays little if any part in analyzing whether Cavenah's disqualification motion was timely under the continuation rule.[10] Under the current state of the law, if a motion complies with the statutory conditions, "a court should . . . grant a disqualification motion—even if the court suspects that the party has abused its right to utilize section 170.6." (*La Seigneurie U.S. Holdings, Inc. v. Superior Court* (1994) 29 Cal.App.4th 1500, 1505 [35 Cal.Rptr.2d 175].) It is up to the Legislature to address any concerns that the legal community has in this regard.

■ Our conclusion on the timeliness issue is dictated by the precedents: a lawsuit against a different albeit related defendant alleging additional and different bases of liability as to that defendant is not, without more, a "continuation" within the meaning of *Jacobs, McClenny*, or any other precedent. We do not mean to announce a rule that all it takes to prevent a section 170.6 motion from being denied in a second related action is to name a party who was not included in the first action. We simply observe that the fact that the second lawsuit arises from "substantially the same acts of

---

[9] *Solberg* observed that, when the Supreme Court initially found the statute constitutional, it "stressed the importance of maintaining the appearance as well as the fact of impartiality" and recognized "the inherent difficulty of proving a state of mind such as prejudice," reasoning that in order to insure confidence in the judiciary, the Legislature could reasonably conclude that the procedure provided in section 170.6 was appropriate. (*Solberg, supra*, 19 Cal.3d at pp. 192–193.)

[10] The same is true of NutraGenetics's claim that a disqualification motion in the circumstances of this case interferes with "the efficient administration of justice." Most disqualification motions do just that, but efficiency is not a consideration in determining whether one case is a continuation of another. (See *City of Hanford v. Superior Court* (1989) 208 Cal.App.3d 580, 593 [256 Cal.Rptr. 274] ["[a]ssigning the same judge to hear a series of complex actions, such as these where there exists subject matter overlap, may promote judicial efficiency. However, judicial efficiency is not to be fostered at the expense of a litigant's rights under section 170.6 to peremptorily challenge a judge"].)

misconduct" as the first may make the two actions related cases, but that fact cannot, standing alone, turn one case into a continuation of the other. We hold only that based on the facts of these two actions, *Cavenah II* was not a mere continuation of *Cavenah I*. Therefore, the section 170.6 affidavit in *Cavenah II* was timely, and Judge Kendig acted properly in accepting it.

## DISPOSITION

The order to show cause is discharged. NutraGenetics's petition for writ of mandate or other appropriate relief is denied and this court's July 30, 2009 temporary stay order is vacated. The real party in interest is entitled to recover his costs.

Flier, Acting P. J., and Bigelow, J., concurred.

A petition for rehearing was denied December 14, 2009.